IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| MILLERCOORS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-218-WMC |
| | ) | |
| ANHEUSER-BUSCH COMPANIES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Anheuser-Busch Companies, LLC's Brief in Opposition to
MillerCoors' Motion for Preliminary Injunction**

Competition in the beer industry is fierce, driven by healthy rivalries among the major brewers as well as the growth of craft beer. As America's best-selling beer, Bud Light is often targeted by competitors. Bud Light has been the subject of comparative advertising from MillerCoors for years.

During Superbowl LIII, Bud Light responded. It ran its own comparative advertising focused on transparency. These ads explain that Bud Light is brewed with four essential ingredients – rice, barley, hops, and water. They also point out that – unlike Miller Lite and Coors Light – Bud Light is <u>not</u> brewed with corn syrup. The ads are truthful and accurately list Miller Lite's and Coors Light's ingredients. Miller Lite and Coors Light have admitted that they use corn syrup as an ingredient, but now want to stifle Bud Light from telling anyone.

Bud Light leads with transparency, while MillerCoors only pays lip service to it. Anheuser-Busch ("AB") was the first major brewer to disclose the ingredients for its beers on a website. Now Bud Light is the first major U.S. beer to have an ingredients panel on its

1

packaging.  Bud Light wants consumers to have more information to assist them in their purchasing decisions.

MillerCoors has acknowledged for years that it uses corn syrup as an ingredient in Miller Lite and Coors Light, but it has spent the last ten weeks trying to spin that fact.  It now wants to prevent its competitor from revealing these ingredients – seeking a court order prohibiting Bud Light from uttering the words "corn syrup" without then also adding a slew of lawyerly disclaimers.  It wants these disclaimers even though Coors Light and Miller Lite never included them on its own list of ingredients before.  Bud Light is telling consumers a simple truth:  it does not include corn syrup as an ingredient; Miller Lite and Coors Light do use corn syrup.  That's transparency.

MillerCoors has failed to make the necessary showing to warrant the extraordinary remedy of a preliminary injunction.  It is not likely to succeed on the merits.  MillerCoors' motion offers a series of legal arguments that are contradicted by its own prior conduct and its current public statements.  After acknowledging that corn syrup is used as an ingredient in Miller Lite and Coors Light, MillerCoors asserts to the Court that it is misleading for Bud Light to identify corn syrup as an "ingredient."  MillerCoors further asserts that it is misleading to say that its beers are "made" with, "brewed" with, or "use" corn syrup despite using those precise words itself.  MillerCoors also contends that it will be irreparably harmed if consumers learn that Miller Lite and Coors Light have corn syrup as an ingredient even though it has told the marketplace that it has benefitted from the ads.

Before and after Super Bowl LIII, MillerCoors featured corn syrup as an "ingredient" of its products, including on websites for both Miller Lite and Coors Light.  MillerCoors cannot have been harmed, irreparably or otherwise, by Bud Light's repetition of what MillerCoors itself

has said.  As courts have recognized, a plaintiff has no viable claim for misleading advertising when the defendant uses the same language as the plaintiff.  Moreover, although MillerCoors charges that Bud Light misleads consumers by stating that Miller Lite and Coors Light are "brewed" with, "made" with, or "use" corn syrup, MillerCoors used <u>all three</u> of these same words repeatedly within the first 72 hours after the Super Bowl.[1]

MillerCoors now says there is no corn syrup in its beer, because that ingredient disappears from the final beer through fermentation; in other words, the corn syrup ferments and becomes alcohol (which is a desired attribute in a beer).  But corn syrup is no less an ingredient of MillerCoors' beers than are barley and hops.  Putting aside that corn syrup is cheaper, MillerCoors chose corn syrup for its own reasons, including taste.  MillerCoors <u>admits</u> that corn syrup is "used to lighten the overall body and deliver a more refreshing beer," and that it impacts the taste of its beer: "the 'corn syrup' … helps make Miller Lite taste so great."  Thus, corn syrup is an ingredient of Miller Lite and Coors Light, and in MillerCoors' <u>own words</u>, that ingredient affects the taste of the finished product.

MillerCoors' irreparable harm arguments are similarly contradicted by its own public statements.  On its "Behind the Beer" blog, the brewer touts that since Bud Light's "new campaign launched … [t]he two beers its ads primarily target, Coors Light and Miller Lite, each have held their share trends, per Nielsen.  Miller Lite, in fact, continues to pick up share in total

---

[1] The plain language of MillerCoors' websites can be contrasted with the disclaimers that MillerCoors now believes to be crucial.  MillerCoors for years has described corn syrup without qualification as an "ingredient."  It now describes it as a "fermentation aid" or "fermentation adjunct" not "present" in the final product.  Those new disclaimers first appearing in litigation cannot mask that, during the brewing process, MillerCoors uses corn syrup to brew Miller Lite and Coors Light.  MillerCoors further admits that corn syrup has an impact on those beers' taste.

beer…."  It is impossible to square MillerCoors' suggestion of irreparable harm with what it is telling consumers and the market.

MillerCoors' executives' statements likewise prove that its claim of irreparable harm rings hollow.  In its pleadings, MillerCoors alleges that Bud Light's advertising is irreparably damaging its products and the beer industry as a whole.  But that was not what it said after the ads ran.  While the Super Bowl was still being played, MillerCoors' Chief Communications Officer texted AB Vice President of Communications, stating "Game on," "I love this stuff," and "See you on the battlefield."  The next morning, the same MillerCoors CCO texted AB's Vice President of Corporate Affairs, stating that the commercials were a "gift," a "massive gift," and exclaimed "This is awesome!"  Later that day, MillerCoors tweeted that it is "happy to have this fight any day of the week."

True to its word, MillerCoors has continued to compete with Bud Light in the marketplace.  Just one day before filing this lawsuit, MillerCoors aired two new ads parodying Bud Light's mythical "Dilly Dilly" kingdom – building upon the Bud Light ads that it now seeks to enjoin.  MillerCoors wants to continue to battle Bud Light on taste, while at the same time seeking to prevent Bud Light from competing on ingredients, and even on the concept of transparency in ingredients.

Ingredients matter.  They differentiate products, and consumers want to know what specifically is used to brew their beers.  AB was the first to put Bud Light's ingredients on its own website, and the first to put ingredients on its packaging.  MillerCoors offers no complaint there.  Now, however, MillerCoors wants to be protected from Bud Light's advertising that tells consumers what ingredients are used to brew Miller Lite and Coors Light, which are the very ingredients MillerCoors includes on its website.  If MillerCoors believes its brands' reputation

4

for quality has been harmed, this is due to its own ingredient decisions, not Bud Light's decision to tell consumers about them.

For these reasons and those set forth below, MillerCoors' Motion for Preliminary Injunction should be denied.

## Background

### A.     The Movement Toward Disclosure of Ingredients in the Beer Industry

The U.S. beer industry is regulated by the United States Treasury's Alcohol and Tobacco Tax and Trade Bureau.  Unlike products that are regulated by the U.S. Food and Drug Administration, brewers are not required to disclose the ingredients used to make their beers.

In 2014, a food blogger named Vani Hari published an online petition asking AB and MillerCoors to "disclose their ingredients online."  Harrison Dec., Ex. 19 (June 17, 2014, "Big Update: The Truth that Beer Companies Have Not Made Public Yet").  AB, as the industry leader, was the first major brewer to disclose the ingredients for its beers online, beginning with its iconic brands Budweiser and Bud Light.  Goeler Dec. ¶ 12.

Soon thereafter, MillerCoors began to disclose corn syrup as an "ingredient" of Miller Lite and Coors Light, without qualification, on the "Our Brands" pages of its website.  For example, an archived copy of these pages from June 2015 states:



**Coors Light**

Coors Light, the World's Most Refreshing Beer, is the second best-selling beer in the U.S. Coors Light's unique frost-brewing process locks in a taste as cold as the Rockies. It has been a favorite in delivering the ultimate in cold refreshment ever since it launched in 1978. The simple, silver can caught people's attention and the brew was nicknamed the "Silver Bullet" as sales climbed. Coors Light is constantly bringing innovation to its bottles and cans, with recent features including the Cold Activated Bottle, Super Cold Draft, the Vented Wide Mouth Can with Frost Brew Liner, the Cold Activated Can and Two-Stage Cold Activation bottles and cans. Ingredients: Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hop Extract.



**Miller Lite**

Miller Lite is the great tasting, less filling beer that created the American light beer category in 1975. Triple-hops brewed for great pilsner taste, Miller Lite is the only beer to win four gold awards in the World Beer Cup for best American-Style light lager (2006, 2002, 1998 and 1996). It also won the gold medal for best American-style Lager or Light Lager at the 2010 Great American Beer Festival. Ingredients: Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hops and Hop Extract.

Miller Brewing Company

Visit the site 🔗                                                        Visit us on Facebook  [f]

Harrison Dec., Exs. 1-2 (June 24, 2015, MillerCoors "Our Brands") (emphasis added).[2]

Over the past several years, MillerCoors has continuously stated <u>without qualification</u> that corn syrup is an "ingredient" in Miller Lite and Coors Light.  The company's "Brand Nutritional Data" for Coors Light for years up until Super Bowl LIII, depicted the following:

Revised 12/18/2018

| Brand | Brand Style | ABV | Total Calories | Total Fat (grams) | Calories from Fat | Saturated Fat (grams) | Trans Fat (grams) | Cholesterol (mg) | Sodium (mg) | Total Carbohydrates (grams) | Fiber (grams) | Sugars (grams) | Protein (grams) | Ingredients |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Colorado Native Saison | Saison | 5.3 | 140 | 0 | 0 | 0 | 0 | 0 | 20 | 7.7 | 0 | 0 | 1.6 | Water, Barley Malt, Wheat Malt, Raw Wheat, Hops, Yeast |
| Colorado Native Winterfest | German-Style Bock | 6.8 | 211 | 0 | 0 | 0 | 0 | 0 | 25 | 17.4 | 0 | 1 | 2.5 | Water, Barley Malt, Yeast, Hops |
| Coors Banquet | American-Style Lager | 5.0 | 147 | 0 | 0 | 0 | 0 | 0 | 15 | 11.7 | 0 | 0 | 1.0 | Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hop Extract |
| Coors Light | American-Style Light Lager | 4.2 | 102 | 0 | 0 | 0 | 0 | 0 | 10 | 5.0 | 0 | 1 | < 1.0 | Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hop Extract |

MillerCoors did the same for Miller Lite:

Revised 12/18/2018

| Brand | Brand Style | ABV | Total Calories | Total Fat (grams) | Calories from Fat | Saturated Fat (grams) | Trans Fat (grams) | Cholesterol (mg) | Sodium (mg) | Total Carbohydrates (grams) | Fiber (grams) | Sugars (grams) | Protein (grams) | Ingredients |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miller High Life Light | American-Style Light Lager | 4.1 | 107 | 0 | 0 | 0 | 0 | 0 | 10 | 6.2 | 0 | 0 | < 1.0 | Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hop Extract |
| Miller Lite | American-Style Light Lager | 4.2 | 96 | 0 | 0 | 0 | 0 | 0 | 5 | 3.2 | 0 | 0 | < 1.0 | Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hops and Hop Extract |

Goeler Dec. ¶ 17.

Even after the Super Bowl, MillerCoors identifies corn syrup as an ingredient in its consumer facing webpages.  For example, consumers who visit the "Our Great Beers" web pages for MillerCoors as of April 18, 2019 will see corn syrup listed without qualification:

---

[2] In continued recognition of consumers' demand for transparency, and indicative of their commitment to it, AB and MillerCoors went a step further two years later with the Beer Institute's Voluntary Disclosure Initiative.  AB and MillerCoors voluntarily agreed to disclose the ingredients for their products online, as well as additional nutritional information on the label or on packaging, by the end of 2020.



## Coors Light

### Coors Light

Adolph Coors established his brewery in the Rockies in the 1870s. In 1978, Coors Light was born in the breathtaking Rocky Mountains, a setting that continues to inspire our brewing today.  Coors Light is always lagered below freezing and cold-filtered, resulting in brilliant clarity, and a clean, crisp taste. Coors Light is bottled cold and never heat pasteurized, which means you get the ultimate in cold refreshment, every time.

Ingredients: Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hop Extract

Visit the site



## Miller Lite

### Miller Lite

Miller Lite is the original light beer. Introduced in 1975, Miller Lite was brewed to be a great tasting beer that just happened to be light, not some lesser version of a full-calorie beer. While many other light beers have been developed over the years, Miller Lite remains the original, always upholding Miller's commitment to "quality uncompromising and unchanging." The Miller Lite recipe uses a unique blend of choice Saaz and Pacific Northwest hops and a significant amount of caramel malt. In addition, we are still proud to use the same strain of brewer's yeast that Frederick Miller brought with him from Germany in the 1850's. Our beer continues to be purposefully brewed for more taste, aroma and golden color than other light beers, with just 96 calories.

Ingredients: Water, Barley Malt, Corn Syrup (Dextrose), Yeast, Hops and Hop Extract

Visit Miller Lite

7

Goeler Dec. ¶¶ 18-19.  Thus, even after filing its lawsuit, MillerCoors has not added this "crucial context[]" to all of its own consumer-facing communications, while at the same time seeking a ruling forcing AB to do so. An ingredient is an ingredient.  Corn syrup is an ingredient, full stop.

In contrast, Bud Light is <u>not</u> made with corn syrup.  Bud Light has four essential ingredients: barley, hops, rice, and water.  *Id.*, ¶ 8.  Although the ingredients in Bud Light have been published on AB's website since 2014, in February 2019 Bud Light became the first major beer in the United States to include an ingredients label on its packaging.  *Id.* at ¶ 12.  The new label includes a list of ingredients and per-serving information on calories, carbohydrates, fat, and protein.  *Id.*  It continues and confirms Bud Light's position as the industry leader in providing consumers with transparency.

### B.    MillerCoors' Comparative Advertising

The market for light domestic lager beers in the United States is highly competitive.  In the U.S., Bud Light is the best-selling beer, followed by Coors Light and Miller Lite.  *Id.*, ¶ 6.  MillerCoors has been aggressively running comparative advertising since before 2016.  *Id.* ¶ 10.  These ads target Bud Light with a comparison of calories and carbohydrates, which are specific product attributes that MillerCoors believes give Miller Lite an advantage.  *See also* Harrison Dec., Ex. 20 (Sept. 26, 2016 *Fortune* article, "Miller Lite is Going Hard After Bud Light in its New Ads"); Ex. 21 (Feb. 4, 2019 WI Public Radio, "Fight for Beer Customers Bubbles Up Following Super Bowl Ad" and stating "Miller Lite has been using a lot of competitive messaging").  For example, on February 2 and 3, 2019 (the weekend of Super Bowl LIII), before Bud Light's commercials aired, MillerCoors posted two variations of the following on its corporate Twitter account:



*Id.*, Ex. 22 (Feb. 3, 2019); Goeler Dec. ¶ 11.

**C.     Bud Light Responded With Truthful Claims about Beer Ingredients.**

In response to MillerCoors' comparative advertising, Bud Light introduced an advertising campaign focusing on a product attribute for which it believed it had an advantage – <u>ingredients</u>.

The campaign began with the "Special Delivery" spot that ran during the first quarter of the Super Bowl.  It was followed by the "Medieval Barbers" and "Trojan Horse" spots during the Super Bowl, then with "Cave Explorers" and "Mountain Men" spots in the weeks following the Super Bowl, and finally the "Thespians" spots during the Academy Awards.  Bud Light also created a variety of accompanying creative assets, such as point-of-sale display materials and billboard signage.

Throughout the campaign, Bud Light has described the ingredients in Miller Lite and Coors Light in the same way that MillerCoors does on its website even to this day, and the same way that MillerCoors has done repeatedly before and after the Super Bowl.  Bud Light has never

disparaged corn syrup,[3] suggested that corn syrup is "in the finished product," or even mentioned the words "high fructose corn syrup" ("HFCS").[4]  Rather, building its campaign around its medieval theme allowed Bud Light to communicate the ingredients in a truthful and clear manner – but also in a whimsical, fantastical way.

### D.      MillerCoors' Public Response to the Advertising Confirms its Use of Corn Syrup and Injected HFCS into the Dialogue.

Almost immediately following the first airing of "Special Delivery," MillerCoors started responding to AB and consumers.  Before halftime of the Super Bowl, MillerCoors' Chief Communications Officer Pete Marino admitted MillerCoors "**_uses_**" corn syrup, and then called out AB's products that contain HFCS.



---

[3] Indeed, it would make no sense for it to do so because Anheuser-Busch proudly lists corn syrup as an ingredient in a number of products where it fits the flavor profile.

[4] Just one week before the filing of this lawsuit, these advertisements were validated by a ruling by the Beer Institute's Code Compliance Review Board ("CCRB"), an independent three-person panel comprised of the former chancellor of the University of Texas, the current producer for the Commission on Presidential Debates (and former Board Member of Mothers Against Drunk Driving), and the former Attorney General of the State of Tennessee.  In a response to a claim from a consumer, the CCRB ruled that the advertising did not disparage the MillerCoors' beers and were factual and did not suggest that their beers contained objectionable additives or ingredients.  (_See_ Harrison Dec., Ex. 30 (March 14, 2019 CCRB Ruling), stating "[t]here is no question that MillerCoors uses corn syrup in the production of Coors Light and Miller Lite. MillerCoors has stated both in tweets and advertising that the firm uses corn syrup."). The CCRB further stated that MillerCoors' New York Times ad "acknowledges both the humor and veracity of AB's commercial." _Id._

Goeler Dec., ¶ 20.

A couple hours later, MillerCoors made comments specifically calling out HFCS:



Miller Lite also admitted on Twitter that it is "**made**" with corn syrup.  In response to a message from a corn farmer about Miller Lite's use of corn syrup it posted the following:



Goeler Dec. ¶ 21.  Around that same time, Mr. Marino had the following exchange with AB's Vice President of Communications:





Hart Dec. ¶¶ 3-4.

By the time the confetti had stopped falling down on the New England Patriots, MillerCoors had informed consumers that it "use[s]" corn syrup in Miller Lite and Coors Light, told consumers that Miller Lite is "made" with corn syrup, raised the idea that "corn syrup" is added "to the final product," voluntarily injected HFCS into the discussion, and expressed its pleasure in being given the opportunity to compete on the issue of ingredients.

MillerCoors' activity only intensified in the following days. Early that next morning, Mr. Marino sent the following texts to AB's Vice President of Legal and Corporate Affairs:



Vargas Dec., ¶¶ 3-4.

MillerCoors was also extremely active on social media, stating that it is "proud" of the very same ingredients whose mention it now claims to cause irreparable harm, and informing consumers that it was "happy to have this fight any day of the week" (nowhere mentioning any notion of being irreparably harmed):[5]



---

[5] This contrasts with what was reported in Beer Business Daily on February 4th, which stated that "One source reveals that #corngater or whatever you want to call it has been a long-known blind spot for Miller Lite and Coors Light.  Certain MC employees had raised the issue in the company as a potential liability several years ago, and now there's not much MillerCoors can do about it as all their breweries are plumbed for corn syrup…."  Goeler Dec. ¶ 28.

Goeler Dec., ¶ 22.

In a post on its "Behind the Beer" blog on February 4th, MillerCoors again noted that several A-B products use HFCS, and further stated that nutritionists refer to HFCS as "Public Health Enemy No. 1." *Id.*, ¶ 36.

Two days after the Super Bowl – on Tuesday, February 5, 2019 – Miller Lite published a full-page advertisement in the New York Times (which has more than 4 million subscribers) and confirmed its use of corn syrup. *Id.*, ¶¶ 23-24; Harrison Dec., Ex. 8 (Feb. 5, 2019 "Dear Beer Drinkers of America").  The ad, which MillerCoors retweeted, is styled as an open letter to the "Beer Drinkers of America" and states, "Miller Lite is indeed **brewed** with 'corn syrup.'"  A later paragraph reiterates, "the 'corn syrup,' is a fact." *Id.*  There is absolutely no mention of AB's advertising being misleading; rather, the ad is discussed as though it asserts simple facts. The advertising discusses "the distinction between 'corn syrup' and high-fructose corn syrup," thus drawing HFCS into the public dialogue again:

**Dear Beer Drinkers of America,**

You may have seen an ad on the Big Game going to great lengths to explain that Miller Lite is brewed with "corn syrup," while Bud Light is not. That's a fact. Miller Lite is indeed brewed with "corn syrup." We'd like to thank our competitors for taking the time and money to point out this exciting fact to such a large, national audience not once, but twice.

You see, the "corn syrup" we source from America's heartland helps make Miller Lite taste so great. (We should mention that a majority of American beer drinkers agree that Miller Lite has more taste than Bud Light. So, when we say Miller Lite has great taste, it's not puffery. It, like the "corn syrup," is a fact.) But back to that syrup.

What might have gotten a little lost between the parties and the wings on Sunday is the distinction between "corn syrup" and high-fructose corn syrup. To be clear, "corn syrup" is a normal part of the brewing process and does not even end up in your great tasting can of Miller Lite.

It's unfortunate that our competitor's Big Game ad created an unnecessary #corntroversy. However, we thank them for starting this conversation on such a big stage because it allows us to clarify the truth and remind beer drinkers that Miller Lite has more taste than Bud Light with fewer calories and half the carbs.

That's just a fact.
#ItsMillerTime

Harrison Dec., Ex. 8.

MillerCoors' statements use all three words <u>now</u> complained of – "brewed," "made," and "use" – within just three days of the Super Bowl.  Just a few weeks later, on March 20, 2019, MillerCoors launched a responsive campaign with a series of ads pretending that the actors on the AB set drink Miller Lite.  Conveniently timed to air just before this lawsuit was filed, these ads make clear that MillerCoors has no basis for requesting a preliminary injunction.

MillerCoors' Chief Communications Officer Pete Marino said himself that these ads were an attempt to "pivot to a message of what our brands stand for."[6]

### E.    MillerCoors Has Made Claims of Increased Sales and Market Share.

MillerCoors' claims of "irreparable harm" in this lawsuit are flatly contradicted by its statements to the public.  As Beer Business Daily reported the day after the Super Bowl: "MillerCoors' spokesman told [the reporter] privately that they were actually excited that AB opened the door to the conversation."  Goeler Aff. ¶ 27.  The February 5 full-page ad in the New York Times thanked Bud Light for "starting this conversation on such a big stage."  *Id.*  On February 8, 2019, Mr. Marino claimed in an interview that Bud Light's ads "in some ways did us a favor."  Harrison Dec., Ex. 23 (Cheddar Video Marino Interview Transcript).  Gavin Hattersley, MillerCoors' CEO called the advertisements a "gift."  Goeler Dec. ¶ 30.

According to MillerCoors, however, AB's ads had no impact on Miller Lite or Coors Light sales.  In fact, nearly seven weeks following the Super Bowl, in an article for PR Week on March 27, 2019, Mr. Marino stated sales for Miller Lite and Coors Light "stayed pre- and post-Super Bowl along the same trajectory."  Harrison Dec., Ex. 24 (Mar. 27, 2019, "Experts: MillerCoors' lawsuit over Anheuser-Busch corn syrup ads is a step too far").

 Despite its claims of irreparable harm to this Court, MillerCoors has repeatedly contended publicly that it is not suffering any harm in its battle for consumers.  On March 8, 2019, Anup Shah, Vice President for the Miller brands at MillerCoors, stated on MillerCoors' blog, "Given our consistent growth across all channels, we are confident that Bud Light's attempts to knock us off our path are not working."  *Id.*, Ex. 9.  Mr. Shah later claimed, "Bud

---

[6] "Miller Lite Co-Opts Bud Light's 'Dilly Dilly' World in Attack Ads,"
https://adage.com/creativity/work/miller-lite-real-world/1729281 (last accessed April 18, 2019.)

Light's sales continue to decline and Miller Lite continues to pick up share among American light lagers.  We are confident that our competitive advertising highlighting the positive attributes of Miller Lite is working."  *Id.*, Ex. 10.

MillerCoors and its executives, including Adam Collins, Vice President of Communications and Community Affairs, have made similar claims of share gains, brand growth, and increased sales for Miller Lite since the Bud Light advertisements:









Harrison Dec., Exs. 17, 18, 25-26; Goeler Dec. ¶¶ 31-32.

MillerCoors' claims of irreparable harm are fundamentally at odds with its boasts that Miller Lite is "up 1.2% in sales dollars and up .2% in sales volume," and has "[p]osted share gains among mainstream beers in every channel." Goeler Dec. ¶¶ 31-32.

## Argument

"[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. v. Dresser Indus.*, 749 F.2d 380, 389 (7th Cir. 1984); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").[7] The movant must satisfy a requirement of "substantial proof [that] is much higher" than on a motion for summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

In the Seventh Circuit, a party seeking a preliminary injunction must prove three threshold elements: (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm absent the injunction. *Planned Parenthood v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). "A party seeking a preliminary injunction must satisfy all three requirements in the 'threshold phase'…." *HH-Indianapolis v. Consol. City of Indianapolis*, 889 F.3d 432, 437 (7th Cir. 2018). Only where the moving party makes this showing does "the court balance[] the harms to the moving party, other parties, and the public." *Eli Lily v. Arla Foods*, 893 F.3d 375, 381 (7th Cir. 2018).

---

[7] Other circuits have applied *Winter* in false-advertising cases. *See, e.g.*, *Ferring Pharm. v. Watson Pharm.*, 765 F.3d 205, 210, 217 (3d Cir. 2014) (denying preliminary injunction).

MillerCoors seeks a preliminary injunction to prevent a competitor from marketing truthful information about corn syrup that MillerCoors has acknowledged for years.  It also requests emergency relief under the theory that the ads may confuse consumers as to whether its beers contain HFCS.  However, MillerCoors has not made the "clear showing" required for this extraordinary remedy, and its motion should be denied.

## I.   MillerCoors Is Unlikely to Succeed on the Merits of its False Advertising Claim.

The Lanham Act forbids false or misleading statements of fact "in commercial advertising or promotion" regarding "the nature, characteristics, qualities, or geographic origin of … goods." 15 U.S.C. § 1125(a)(1)(B).  To establish a Lanham Act violation for false advertising, a plaintiff must prove "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax v. Turtle Wax*, 191 F.3d 813, 819 (7th Cir. 1999).  A plaintiff must show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 133 (2014).

Bud Light has a "perfect legal right" to advertise truthful statements about corn syrup. *Danone v. Chobani*, 2019 WL 760040, at *13 (S.D.N.Y. 2019).  Doing so advances the "free flow of commercial information" that is "indispensable" to intelligent consumer decision-

19

making.  *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 763-65

(1976); *Mead Johnson v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000), amending 201 F.3d

883 (7th Cir. 2000) (noting that comparative ads help consumers find superior products).

MillerCoors "should have turned to an advertising agency, not a court, in search of a response to

its business rivals."  *First Health v. BCE Emergis*, 269 F.3d 800, 805 (7th Cir. 2001).  Indeed, it

has done exactly that.  MillerCoors' marketing of "taste" claims and Bud Light's ads are

examples of sophisticated companies competing for consumers in the marketplace.  Moreover, as

noted above, Miller Lite has already launched a nationwide ad directly targeting the Bud Light

ads.[8]

Further, there can be no doubt that one competitor is free to discuss what differentiates its

products from others and thus comparative advertising highlighting ingredient differences has

been approved.  *See Johnson & Johnson*Merck v. SmithKline Beecham*, 960 F.2d 294, 296, 301

(2d Cir. 1992).  Similarly, in *Danone*, the court denied a preliminary injunction, and in rejecting

Dannon's claim of reputational harm, remarked that Chobani "had a perfectly legal right to beat

Dannon at its own game by marketing a competing product that has less sugar."  2019 WL

760040, at *13.  There is no need for court involvement in this dispute; the contest should be

waged in the marketplace.

### A.    Bud Light's Advertisements Are Truthful and Not Misleading.

The Lanham Act proscribes two types of false statements: those that are literally false,

and those that are "literally true or ambiguous, but which implicitly convey a false impression,

---

[8] MillerCoors' CEO acknowledged this, stating "our distributors….  are fiercely competitive and
they like nothing more than a good fight."  Goeler Dec. ¶ 30

are misleading in context, or likely to deceive consumers." *Hot Wax*, 191 F.3d at 820.

MillerCoors fails to show a likelihood of success under either theory.[9]

### 1.      Bud Light's advertisements are not literally false.

Bud Light's comparative ads are "truthful on their face" and not misleading. *Pernod Ricard v. Bacardi*, 702 F. Supp. 2d 238, 250 (D. Del. 2010).  The ads claim in an accurate and non-disparaging manner that Miller Lite and Coors Light are brewed with, made with, or use corn syrup as an ingredient, while Bud Light is brewed differently.  They do not suggest that corn syrup is unhealthful or unsafe, or that it is the only or predominant ingredient used in Miller Lite or Coors Light.  The Bud Light King and other characters do not express disgust with corn syrup.  There is no reference to HFCS at all.  Rather, Bud Light's advertising describes the corn syrup ingredient in the same way that MillerCoors does (and has done).  It is "arguably frivolous" to predicate a Lanham Act claim on "the same language [MillerCoors] uses in its own materials." *HealthNow v. Catholic Health Sys.*, 2015 WL 5673123, *6 (W.D.N.Y. 2015).

Unsurprisingly, where a competitor uses language previously used by the plaintiff to describe its products, a Lanham Act claim fails. *See, e.g.*, *id*.  Indeed, it is "unclear how [plaintiff] can press a viable claim for false or misleading advertising against [defendant] for using the same language [plaintiff] uses in its own materials." *Id.*; *see also First Health*, 269 F.3d at 805 (statements not false where used in the same manner as used by government offices).

### 2.      Bud Light's ads do not implicitly convey a false impression and are not misleading in context or likely to deceive consumers.

---

[9] A literally false message "must be unambiguous; if the representation is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false and the advertisement is actionable under the Lanham Act only upon a showing of actual consumer confusion." *Danone*, 2019 WL 760040, at *7 (denying preliminary injunction and holding that Dannon had foreclosed a claim of literal falsity where it showed that Chobani's advertising claim was ambiguous).  Since MillerCoors contends that Bud Light's advertising "is ambiguous," ECF No. 9, p. 23, any claim of literal falsity fails as a matter of law.

21

MillerCoors' arguments as to implied falsity are without merit because, while the ads <u>do</u> point out a difference in ingredients there is nothing false about it.  Rather, that advertising uses words found on the MillerCoors' website product page – which even today does not include the allegedly "crucial context" that corn syrup "is consumed in the fermentation process."  ECF No. 9, p. 24.

The Seventh Circuit has expressly rejected Lanham Act claims that are predicated on consumer misunderstandings, as contrasted with advertising that is false or misleading, stating that "'misleading' is not a synonym for 'misunderstood.'"  *Mead Johnson*, 209 F.3d at 1034; *see also Am. Italian Pasta v. New World Pasta*, 371 F.3d 387, 394 (8th Cir. 2004) ("[T]he Lanham Act protects against misleading and false statements of fact, not misunderstood statements.");  *Pernod*, 702 F. Supp. 2d at 251 (same).

Omitting that it has advertised for years that corn syrup is an ingredient in Miller Lite and Coors Light, MillerCoors argues that Bud Light had a duty to provide a disclaimer about whether there is corn syrup in the <u>finished</u> beer.  MillerCoors did not do that at any time.  Even today, one important part of its website lists corn syrup as an ingredient without caveats or disclaimers.  MillerCoors does not cite a single case for its view that the Lanham Act demands this type of disclosure.  Case law and the legislative history of § 43 are to the contrary: "As courts have routinely held, the Lanham Act does not impose an affirmative duty of disclosure."  *Lokai Holdings v. Twin Tiger*, 306 F. Supp. 3d 629, 639-40 (S.D.N.Y. 2018); *see also Intermountain Stroke v. Intermountain Health Care*, 638 Fed. App'x. 778, 793 (10th Cir. 2016) (noting that "sparse extant case law would not support" any demand for a disclaimer where advertising is not false or misleading); S. Rep. No. 100-515, at 41 (Sept. 15, 1988) ("delet[ing] proposed language

stating that omissions of material information which misrepresent the nature, characteristics or qualities of a product or service are actionable").

MillerCoors speculates that Bud Light's advertising must be misleading because it is "inconceivable" that consumers would care how their beer is brewed if they knew (as MillerCoors now claims) that corn syrup was not in the finished beer. ECF No. 9, p. 26. No evidence is offered to support this claim; it is pure conjecture. Consumers do care how the products they purchase are made. Moreover, the fact that consumers care is shown by MillerCoors posting the ingredients of its beers on its website since 2015.[10] MillerCoors has stated, "We are proud of our products, proud of our ingredients, and value transparency." *Id.* And, the fact that MillerCoors offers visitors brewery tours that feature a half hour look at its "malting, brewing, and packaging process" is further evidence that consumers actually do care how their beer is brewed.[11] Why has MillerCoors professed to support "transparency" in ingredients for years if consumers do not care? Indeed, MillerCoors would not have filed this lawsuit if consumers did not care.

MillerCoors also contends that the phrases "brewed with," "made with," and "uses" "do not foreclose the possibility in consumers['] minds that corn syrup is added as a finishing ingredient to the beer." ECF No. 9, p. 23. There is no evidence of this. Not even MillerCoors' expert makes such a finding. This argument fails for multiple other reasons. <u>First</u>, an abstract claim about a hypothetical "possibility" of confusion is insufficient as a matter of law to satisfy the "clear showing" required for a preliminary injunction, and the Seventh Circuit has rejected Lanham Act claims predicated on consumer misunderstandings. *Mead Johnson*, 201 F.3d at

---

[10] http://www.millercoors.com/beers/nutrition-codes

[11] http://www.millercoors.com/breweries/coors-brewing-company/tours

886-87.  Second, there is no ad that refers to the concept of "finishing ingredients."  Third, as discussed, courts reject Lanham Act claims based on language previously used by the plaintiff to describe its own product – which is the case with the words MillerCoors objects to here.

### 3. MillerCoors' authorities on confusion and deception are inapposite.

Lacking any basis for its claims, MillerCoors turns to comparative advertising case law that bears no resemblance to this case.  In *Arla Foods*, the Seventh Circuit affirmed a preliminary injunction where "the ad campaign center[ed] on disparaging dairy products made from milk supplied by rbST-treated cows."  893 F.3d at 382-83 (emphasis added).  MillerCoors spends little time discussing the facts of *Arla Foods*, which are incredibly different from the Bud Light ads at issue here.  In *Arla Foods*, the ads showed rbST as a six-eyed monster, one which a seven-year old girl described as follows: "rbST has razor sharp horns.  It's so tall that it could eat clouds.  You may want to pet it but the fur is electric."  *Id.* at 380.  The ad concluded with the words, "No weird stuff.  Arla, live unprocessed."  *Id.*

Additionally, there was FDA-guidance that "ads concerning rbST may be misleading if not placed 'in proper context'"; a major cheese producer decided to cease using milk from rbST-treated cows based in part on Arla's ads; and, because the plaintiff was the sole purveyor of an FDA-approved rbST supplement, the court found that "any false or misleading advertising regarding rbST that decreases demand for the supplement will *necessarily* harm [plaintiff]."  *Id.* at 383-84.

While the particular facts in *Arla Foods* were sufficient for a preliminary injunction, they are not analogous to Bud Light's ads, which state information about corn syrup that MillerCoors has published for years.  The non-verbal aspects of the ads are whimsical, humorous, and no message of disgust or danger from drinking the beers are communicated verbally or in imagery.

24

The ads do not call corn syrup "weird" or harmful, and MillerCoors points to nothing that would indicate anything similar.  The claim that it is "less expensive" to brew with corn syrup (versus rice) is true, non-disparaging, and unrelated to health or safety.  Harville Dec., ¶ 2.  There is no contrary regulatory guidance, and as noted above the CCRB rejected a similar challenge to Bud Light's ads.  Unlike *Arla Foods*, since Bud Light's ads began, MillerCoors has made claims of market gains and improved sales.

MillerCoors' reliance on *Abbott Laboratories. v. Mead Johnson*, 971 F.2d 6 (7th Cir. 1992), is similarly misplaced.  In *Abbott*, the district court considered ads that marketed "specific benefits of Ricelyte vis-à-vis Pedialyte," such as "lower osmolality," that Mead claimed were the result of Ricelyte's "link to rice."  *Id.* at 11.  The court found that certain of Mead's claims were literally false because Ricelyte contained only rice syrup solids (lacking the therapeutic benefits associated with whole rice or rice carbohydrates), and its claims of "lower osmolality" had "no therapeutic significance" and were misleading.  *Id.* at 13-15.

After the district court denied a preliminary injunction, the Seventh Circuit reversed but did not hold that Mead's osmolality claims were "false, deceptive, and should be enjoined," as MillerCoors argues.  ECF No. 9, p. 25.  Rather, the Court was "neutral as to the merits" when it declined to overturn the district court's factual finding, reviewable for clear error only, in the context of ads that were also found to be literally false.  *Id.* at 15-16.  The Court also stated: "[W]e expect that the parties will present evidence of consumer and physician reaction to the lower osmolality claim, for only if the claim, which is literally true, actually misleads does it violate the Lanham Act."  *Id.* at 16.  Bud Light's advertising, in contrast, is truthful and makes

no claim of therapeutic significance and was placed in an on-going fantasy-based campaign whose signature element is humor.[12]

MillerCoors cites *Kraft v. FTC*, 970 F.2d 311 (7th Cir. 1992), to argue that consumers "are not likely to know that much" about food processing. *Id.* at 322. But *Kraft* was an FTC-enforcement action, and the Seventh Circuit stated that "Kraft's reliance on Lanham Act decisions is misplaced." *Id.* at 320. Courts have clarified that FTC precedent is largely inapplicable to Lanham Act cases. *E.g., Sandoz Pharm. v. Richardson-Vicks*, 902 F.2d 222, 230 (3d Cir. 1990) (declining plaintiff's "invitation to blur the distinctions between the FTC and a Lanham Act plaintiff"). The ads in *Kraft* drew a nexus between the quantity of milk in a Kraft Single and calcium, substantially overstating the calcium in the product. 970 F.3d at 322. There is nothing comparable here.

Lastly, MillerCoors argues that Bud Light's ads "prey" on so-called consumer confusion about the differences between corn syrup and HFCS. ECF No. 9, p. 26. However, as discussed below, MillerCoors has offered no reliable evidence that such confusion exists. Having failed to establish the predicate of its theory, this argument fails. Moreover, Bud Light's ads do not discuss or mention HFCS; rather, it was <u>MillerCoors</u> who injected HFCS the day of the Super Bowl and afterwards by repeatedly referring to it in its public statements, even calling it "Public

---

[12] MillerCoors' citations to case law from district courts outside the Seventh Circuit are distinguishable. *Chobani v. Dannon*, 157 F. Supp. 3d 190, 203 (N.D.N.Y. 2016), enjoined Chobani's ads that included the hashtag "#nobadstuff," which asserted the literally false message that "Dannon's product contains sucralose and is therefore unsafe to consume" and portrayed the chlorine in sucralose as being equivalent to that used as a disinfectant in swimming pools. *Id.* at 195-97, 203; *see also Polar v. Coca-Cola*, 871 F. Supp. 1520, 521 (D. Mass. 1994) (enjoining ads implying that Coke was not "pure"). There are no comparable facts here.

Health Enemy No. 1." Harrison Dec., Ex. 28 (Feb. 4, 2019 *Behind the Beer*, "About those Bud Light Ads"); Goeler Dec. ¶¶ 20, 25, 37.[13]

### B. MillerCoors Fails to Offer Any Reliable Evidence of Actual Consumer Confusion.

In the Seventh Circuit, a party like MillerCoors whose false advertising claim is based on a theory of implied falsity "must prove that the statement is misleading in context by demonstrated actual consumer confusion." *Hot Wax*, 191 F.3d at 820. It is not sufficient for a plaintiff to show "how consumers *could* react; it must show how consumers actually do react." *AstraZeneca v. Tap Pharm.*, 444 F. Supp. 2d 278, 295–96 (D. Del. 2006) (emphasis added). MillerCoors has failed to introduce credible evidence of actual or likely consumer confusion, and thus is unlikely to succeed on the merits of its Lanham Act claim.

### 1. MillerCoors has not met the stark exception for presuming consumer confusion.

MillerCoors initially contends that consumer confusion should be presumed. This argument is based on Second Circuit case law acknowledging a rebuttable presumption where the plaintiff establishes "that the defendant intended to deceive the public through deliberate conduct of an egregious nature." *Danone*, 2019 WL 760040, at *7. A-B has found no Seventh Circuit case that applies this presumption, and MillerCoors has cited none.

Even assuming this presumption exists in the Seventh Circuit (which Bud Light does not concede), MillerCoors misstates the elements. It applies <u>only</u> where the plaintiff shows that (1)

---

[13] MillerCoors argues that preexisting confusion is actionable but cites no Lanham Act cases to support this claim. ECF No. 9, p. 27. Its reliance on case law and an enforcement order under the FTC Act (a different standard) is misplaced. And, MillerCoors' citation to *Telebrands* is misleading; the Commission found the preexisting beliefs "understat[ed] the extent to which the challenged claims were communicated." *Telebrands v. TV Savings*, Trade Reg. Rep. (CCH) ¶ 15800 (Sept. 19, 2005).

the defendant has intentionally set out to deceive the public, and (2) its deliberate conduct is egregious in nature. *Johnson & Johnson-Merck v. Rhone-Poulenc*, 19 F.3d 125, 132 (3d Cir. 1994) (declining to apply presumption where there was "no evidence of 'deliberate conduct' of an 'egregious nature,' the second part of the *Smithkline Beecham* test"). MillerCoors omits the second element and does not argue (much less introduce evidence) that Bud Light's conduct was deliberate and egregious, thus foreclosing this theory. But even if this "narrow exception" could apply, *Tiffany (NJ) v. eBay*, 2010 WL 3733894, at *3-4 (S.D.N.Y. 2010), MillerCoors also fails to show that Bud Light "intentionally set out to deceive the public" and that its conduct was deliberate and egregious. *Johnson & Johnson-Merck*, 19 F.3d at 131-32; *see also Johnson & Johnson*Merck*, 960 F.2d at 299 (refusing to apply presumption where evidence of intent to mislead was "indirect and controverted"); *Millennium Labs. v. Ameritox*, 924 F. Supp. 2d 594, 600-01 & n.17 (D. Md. 2013) (describing exception as "a narrow one" requiring "stark evidence"). Indeed, it is hard to understand how Bud Light is guilty of "deception" for factual disclosures of ingredient information that repeats what MillerCoors tells consumers.

MillerCoors purports to rely on statements from Mr. Goeler's interview in Food & Wine Magazine, arguing that he said, "AB's internal studies showed that consumers 'prefer not putting something like corn syrup … into their body,' which made it 'pretty clear to [AB] what to highlight.'" ECF No. 9, p. 28. However, the phrases MillerCoors quotes are taken from two separate answers to two different questions and are misleading as cited. Mr. Goeler's complete responses, which are set forth in his declaration, make clear that he was also talking about preservatives and artificial flavors (not just corn syrup). Goeler Dec. ¶ 35.

Importantly, the phrase "what to highlight" was not a reference to "the Campaign" regarding MillerCoors' beers as MillerCoors suggests, ECF No. 9, p. 28, but instead related to

information on Bud Light's new label: "So it was pretty clear to us what to highlight.  If you look at our packaging, we highlight all three of those.  No corn syrup.  No artificial flavors.  No preservatives."  Goeler Dec. ¶ 35.

### 2.     Dr. Wind's litigation survey is unreliable.

To prevail on its claim of implied falsity, MillerCoors must show by extrinsic evidence that Bud Light's ads tend to mislead or confuse consumers.  *See Johnson & Johnson\*Merck*, 960 F.2d at 297-98.  "The question in such cases is – what does the person to whom the advertisement is addressed find to be the message?"  *Id.*; *see also Johnson & Johnson-Merck*, 19 F.3d at 129 ("Public reaction is the measure of a commercial's impact.").  The "value of a survey depends on the manner in which it was conducted—whether the techniques used were slanted or fair."  *Borden v. Kraft*, 1984 WL 1458, at *13 (N.D. Ill. 1984).  Surveys must be "conducted on an objective basis, and the procedures used must be in accordance with accepted standards recognized in the field of statistical surveys."  *Id.*  A survey that fails to account for "preconceived notion[s]" "lack[s] the objectivity required for surveys to be fairly and impartially conducted."  *Id.* at *14.  "The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey."  Diamond, S. *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence, p. 415 (Fed. Judicial Ctr., 3d ed. 2011).  A survey report "should provide in detail: … The <u>exact wording</u> of the questions used, <u>including</u> … <u>visual exhibits</u>."  *Id.* (emphasis added).  While MillerCoors submits the report of Dr. Jerry Wind, a professor emeritus of marketing, his survey methodology departs from accepted practice in the field of statistical surveys.

AB has submitted herewith the report of Professor John R. Hauser, the Kirin Professor of Marketing at the Massachusetts Institute of Technology ("MIT") Sloan School of Management. The principal focus of his research and teaching at MIT has been in the areas of marketing management, new product and service development, consumer satisfaction, marketing research, research methodology, and competitive marketing strategy.  His research includes the evaluation of consumer decision-making, product and service development, customized communications for consumer products, and determination of relative feature preferences and implicit product valuations.  He is an expert on consumer surveys.  Mr. Hauser has concluded that Dr. Wind's survey results are unreliable, and MillerCoors has not provided any credible inference of actual or likely consumer confusion.

> **a.      Dr. Wind's survey and social media analysis are leading, unscientific, and unreliable.**

Dr. Wind conducted a survey that purports to "assess the likelihood of deception, if any, arising from one of the Bud Light commercials stating that Miller Lite and Coors Light are made with corn syrup."   ECF No. 11, ¶ 3.  In the survey, roughly 2,000 "qualified light beer drinkers" were shown a video clip of a test or "control" commercial (Bud Light's "Mountain Men").  *Id.*, ¶ 6.  The control included a 10-second disclaimer, described further below.

At the outset, it is critical to understand that Dr. Wind tested one commercial ("Mountain Men") out of the series of Bud Light advertisements.  This ad did not even run during the Super Bowl.  Most consumers who saw "Mountain Men" also saw "Special Delivery," a longer commercial that aired during the Super Bowl and is the ad which has run most often.  It makes no scientific sense to select "Mountain Men" over any other ad.  The choice could have been calculated, as Professor Hauser explains.  *Id.*, ¶¶ 38-40.  Indeed, the failure to test the advertisement that (a) kicked off this aspect of the ad campaign; (b) ran the most times; and (c)

was seen by the most people, defies any logical explanation except a desire to obtain a particular result via (as next discussed) leading questions about the "Mountain Men" ad.  Dr. Wind provides no explanation as to why he chose "Mountain Men" as opposed to other ads, such as the ads that ran during the Super Bowl.  *American Exp. v. Mastercard*, 776 F. Supp. 787, 790 (S.D.N.Y. 1991) (consumer survey used to attempt to prove one ad conveyed a false and misleading message "has no bearing on [a different] commercial").

MillerCoors relies on three findings from Dr. Wind's survey.  Each is deeply flawed. First, MillerCoors argues that a net 35% of consumers were misled by the ads "into thinking that *Miller Lite* and *Coors Light* contain corn syrup."  ECF No. 9, p. 29.  This figure is based on responses to QF7a and QF7b, which are improper leading questions.  *See Procter & Gamble v. Hoffmann-LaRoche*, 2006 WL 2588002, at *23 (S.D.N.Y. 2006) (survey not credible "if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all").

QF7a stated, "Which, if any, of the following statements does the TV commercial say, suggest, or imply?"  *See* Wind Report, Appendix G, p. G-9 (Questionnaire); Hauser Dec. ¶ 23 n.53.  Respondents were given four choices: (1) Miller Lite/Coors Light are not made with corn syrup; (2) Miller Lite/Coors Light are made with corn syrup; (3) neither; or (4) don't know.  *Id.* Those who answered choice (2) were then shown QF7b, which stated:

> "You said that [BRANDS] is/are made with corn syrup.  Being 'made with' corn syrup may mean a number of different things. Which, if any, of the following statements does the TV commercial say, suggest, or imply about [BRANDS]?  *(Select one only)*"  *Id.*

QF7b gave five multiple-choice answers that were variations on whether or not corn syrup is "used only during the brewing process" or is "in the Miller Lite … you drink."  Wind Report, Appendix G, p. G-9 (Questionnaire); Hauser Dec. ¶ 23 n.54.

As reflected in the Hauser Declaration, these questions depart sharply from accepted practice.  QF7b did not ask respondents if <u>they</u> considered the claim to be ambiguous or, alternatively, ask them an open-ended question regarding the meaning of the claim "made with corn syrup."  Hauser Dec. ¶ 27.  Instead, QF7b expressly instructed the respondents that "[b]eing made with corn syrup may mean a number of different things," and it then gave a fixed universe of possible meanings suggestive of MillerCoors' theory.  Wind Report, Appendix G, p. G-9 (Questionnaire); Hauser Dec. ¶ 30. The question, then, is instructing the respondents that "made with" is ambiguous when the respondents may have not agreed with that statement.  *Id.*  This is likely to cause the respondents to think of additional meanings of "made with" and the respondents will attempt to satisfy the surveyor by adopting what they understand to be the preferred meaning of the surveyor.  *Id.*  Indeed, a survey that similarly attempted to define words according to the plaintiffs' preferred meaning was rejected in *Mead Johnson*, where the Seventh Circuit concluded, "Never before has survey research been used to determine the meaning of words, or to set the standard to which objectively verifiable claims must be held."  201 F.3d at 885 (disregarding survey evidence intended to support plaintiff's interpretation of "1st Choice of Doctors" where it assumed incorrectly that "first is a cardinal number … rather than a place in a series" and was "bound to produce a misleading if not meaningless answer").

As Professor Hauser points out, QF7b also incorrectly assumes the commercial conveys a message about whether there is corn syrup in the final product by instructing the respondent to think of additional meanings and then providing a choice that includes the final product.  Hauser Dec. ¶ 30.  This is confirmed by the fact that when answers were suggested in QF7b, Dr. Wind reported that 61 percent of test group respondents believed corn syrup is in the Miller Lite and/or Coors Light they drink (but only when that option was suggested), Wind Report ¶ 81, but in

response to open-ended questions that were not leading and that did not mention MillerCoors' desired response, not a single participant in the test group (i.e., those who saw the actual Bud Light ad) gave an answer referencing any belief as to whether the corn syrup used in Miller Lite and Coors Light is "in" the beer consumers drink. Simon Dec. ¶ 6. Dr. Wind ignored this evidence. This significant increase in percentages is strong evidence that QF7b is improperly leading and suggestive, making the results unreliable. *E.g.*, *Coors Brewing v. Anheuser-Busch*, 802 F. Supp. 965, 972 (S.D.N.Y. 1992).[14]

Second, MillerCoors argues that "significantly more respondents who saw the test stimulus than who saw the control stimulus believed that the commercial implied that corn syrup and HFCS are the same." ECF No. 9, p. 18. This claim relates to Dr. Wind's opinions based on responses to QF8, which asked: "Which, if any, of the following statements does the TV commercial say, suggest, or imply?" Wind Report, Appendix G, p. G-9. It is closed-ended. Hauser Dec. 43. The response choices are: (1) "corn syrup and high fructose corn syrup are the same"; (2) "corn syrup and high fructose corn syrup are different from one another"; (3) "neither of the statements"; or (4) "don't know/unsure." This question is improper and leading because the ads do not mention "high fructose corn syrup." Only 1.4% of the test group survey respondents volunteered "high fructose corn syrup" in response to the prior open-ended questions. Hauser Dec. ¶ 46; *see Borden*, 1984 WL 1458, at *15 (rejecting 5% of survey

---

[14] Other problems with QF7b include the following: first, Dr. Wind's data shows that more respondents in the control group selected MillerCoors' desired "correct" answer to QF7b. The "correct" answer mirrors the language in the control group's disclaimer video. This reflects phrase recognition rather than consumer understanding. Hauser Dec. ¶¶ 31-32. Second, QF7b incorrectly dictates to respondents that "[y]ou said" Miller Lite/Coors Light is "made with" corn syrup. *Id.*, ¶ 26. This mischaracterizes the respondents' answers to QF7a, which did not ask for their personal beliefs, but asked instead what the ad said, suggested, or implied. *Id.* By misstating their prior answers, Dr. Wind's survey guided attention towards a particular theme, allowing respondents to guess the survey's purpose and leading to flawed results. *Id*

responses as "insignifican[t]").  Dr. Wind improperly introduced the concept of HFCS into the respondents' minds through QF8 when it was not otherwise present.  (In that way, the survey is much like MillerCoors' own advertising campaign.)  As a result, his opinions based on QF8 are entitled to no weight.

Dr. Wind also states that consumers hold pre-existing beliefs regarding HFCS, but fails to measure them or control for them.  Hauser Dec. ¶¶ 44, 47-48.  Instead, he asserts in conclusory fashion that they exist and that Bud Light capitalized on them with its ads.  *Id.*, ¶ 47. This conclusion is unsupported by Dr. Wind's survey or analyses.  *Id.*, ¶ 52.

Third, MillerCoors asserts that Dr. Wind's opinions are "confirmed by social media evidence."  ECF No. 9, p. 29.  The so-called "evidence" is nothing more than anecdotal examples of social-media posts and consumer comments related to corn syrup and Bud Light, Miller Lite, or Coors Light.  Courts are highly skeptical of this type of evidence.  *E.g., QVC v. Your Vitamins*, 439 Fed. App'x 165, 168-69 (3d Cir. 2011) (cautioning against relying on blog posts for evidence of consumer deception).  Dr. Wind provides no evidence that the consumer communications he purports to have analyzed are representative of <u>all</u> (or even any material component of) potential MillerCoors consumers.  Hauser Dec. ¶ 53-54; *see also Aviva Sports v. Fingerhut Direct Mktg.*, 829 F. Supp. 2d 802, 825 (D. Minn. 2011) (excluding expert testimony based on deposition testimony of complaining customers because the expert "had no factual basis for forming conclusions related to <u>non-complaining</u> consumers").

Dr. Wind provides no evidence that his social media "study" is a reliable representation of potential MillerCoors consumers.  This study is not a scientifically accepted method of measuring whether an ad is misleading.  Rather, Dr. Wind's methodology makes the unrealistic assumption that "every follower of every author read every one of their Tweets."  Hauser Dec. ¶

58.  This exaggerates the reach of A-B's own social media posts.  *Id.*, ¶ 57.  Bud Light's expert

Professor Hauser re-ran a similar study with a more accurate universe and found that Dr. Wind's

results were severely overstated.  *Id.*, ¶¶ 61-62.

MillerCoors also relies heavily on the purported 18% of people who wrote to the

Consumer Affairs Department from February 4 to March 22, 2019 (and whose communications

it classifies as "related to corn syrup") who would "end or decrease" their purchases of Coors

Light and Miller Lite.  ECF No. 11, pp. 38-40.  However, MillerCoors omits that this 18%

represents just **32 total people out of the approximately 100 million** who watched the Super

Bowl or the "hundreds of millions" who it has alleged have viewed the ads.  ECF No. 9, p. 35.

And, it omits that another 4% indicated a likelihood to "begin or increase" their purchase of

Coors Light and Miller Lite.  ECF No. 11, pp. 38-40.  Thus, MillerCoors' claim centers on a net

total of 25 people out of "hundreds of millions."  A claim of consumer confusion cannot be

predicated on such an infinitesimal fraction of the marketplace.  *Muzikowski v. Paramount*, 477

F.3d 899, 908 (7th Cir. 2007) (rejecting affidavits from small number of consumers as

"insufficient" "de minimis evidence of confusion").

Furthermore, Dr. Wind's selective "sampling" of ten comments show that many

consumers accurately understood that corn syrup is used in the brewing process or in connection

with brewing.  *E.g.*, ECF No. 11, ¶ 95 at first bullet ("use corn syrup"); third bullet ("you use

corn syrup"); second bullet ("brewing practice"), fourth bullet ("brewed with corn syrup").

Another consumer made *no* reference to brewing or use.  *Id.* at fifth bullet.  Only one consumer

directly noted that he or she would "ingest" corn syrup.  *Id.* at seventh bullet.  Thus, even the

majority of comments selected by Dr. Wind do not provide support for any claim of "confusion."

Indeed, it appears only one person who called actually raised the issue presented in this motion

and there is no competent evidence that this person is a true or representative consumer of MillerCoors' beers.

      **b.**    **Dr. Wind's report used an improper control and did not provide all backup data.**

Dr. Wind also showed survey participants a revised "Mountain Men" commercial that included a disclaimer with a voiceover reading the disclaimer for the last 10 seconds of the 40-second control video.  Hauser Dec. ¶ 34.  This disclaimer purportedly served as a control for the survey.  The "control" group in this survey was shown a version of the ad with the disclaimer allegedly to "clarify" the "made with" language in the original ad.  The results of the test group and the control group were then compared to assess the impact of the "made with" language on the test group.  In theory, the disclaimer should eliminate any confusion in the control group attributable to the challenged "made with" language.

Dr. Wind has provided contradictory information about his disclaimer, or at a minimum, did not report all of his underlying data.  Hauser Dec. ¶¶ 41-42.  Although MillerCoors' motion papers and proposed findings seem to say that one disclaimer was used in the survey, Dr. Wind's report and backup file refer to <u>two</u> disclaimer videos.  Paragraph 6 of his report quotes one disclaimer as:

> "While Miller Lite and Coors Light are brewed using corn syrup, ***there is <u>NO</u> corn syrup in the Miller Lite and Coors Light you drink.***"

This disclaimer language is also quoted by MillerCoors in its proposed findings of fact, ECF No. 10, ¶ 85, and in its motion for preliminary injunction. ECF No. 9, p. 18 n.5.

Paragraph 15 of Dr. Wind's report then quotes a second disclaimer:

> "While corn syrup is used during the brewing of Miller Lite and Coors Light, ***there is <u>NO</u> corn syrup in the Miller Lite and Coors Light you drink.***"

36

Dr. Wind never clarifies which actual disclaimer the respondents were given and makes no effort to address the fact that he quoted two different disclaimers in his own expert report.

Dr. Wind's backup file does contain only one disclaimer, which is the second one quoted above from ¶ 15 of his report.  Simon Dec., ¶¶ 4-5.  If this disclaimer was the one given, MillerCoors' briefs and proposed findings do not accurately recount the disclaimer actually provided.  A screen shot of the video Dr. Wind provided to AB as what was shown to survey respondents contains text that is not found in MillerCoors' proposed findings and briefs:



Simon Dec. ¶ 5.

Any change to disclaimer language would be significant and even small changes can have an impact on results.  Here, the location of "corn syrup" and the brand names are essentially switched in priority between the two disclaimers.  "The fact that seemingly small changes in wording can cause large differences in responses has been well known to survey practitioners since the early days of surveys."  Hauser Dec. ¶ 42, fn.88; Bradburn, N.M. et al., *Asking Questions: The Definitive Guide to Questionnaire Design- for Market Research, Political Polls, and Social and Health Questionnaires*, Jossey-Bass, 2004, Revised Edition, at p. 4.  Dr. Wind does not explain why he chose the disclaimer for which he reported results.  Hauser Dec. ¶ 41.  It

is possible that Dr. Wind tested both disclaimers and provided results for only the disclaimer that yielded favorable results.  It is also possible that Dr. Wind tested only one disclaimer but did not provide that disclaimer to AB, which would prevent AB from rebutting Dr. Wind's survey.  In any event, the clear difference between the disclaimer quoted in MillerCoors' pleadings and the disclaimer used in the video apparently actually given to survey respondents renders the results unreliable.

In any event, both disclaimers were inappropriate.  Each version effectively told consumers that their common sense understanding of what ingredients are "in" a particular product is wrong without exploring what they might understand "in" to mean in the context of food formulations.  Dr. Wind told respondents "that, if they understand the commercial to include the message that corn syrup is contained in the Miller Lite and Coors Light that consumers drink, that message is not true."  Wind Report, ¶ 16.  As Dr. Wind himself has previously opined, the absence of a proper control, particularly where consumers may hold preexisting beliefs, renders a survey unreliable.  *See Johnson & Johnson\*Merck*, 960 F.2d at 301 (where plaintiff's theory was that truthful ad "exploit[ed] publicly held misperceptions," "a control would likely be indispensable proof").  The use of this control invalidates the survey results because the ad with the prominent disclaimer shown to respondents is not similar to the original ad and it implants MillerCoors' theory into the respondents' minds.  Hauser Dec. ¶¶ 31-36.

In sum, because Dr. Wind's survey is unreliable, MillerCoors has failed to establish the requisite credible inference that consumers were deceived by Bud Light's ads.  *LG Elec. v. Whirlpool*, 661 F. Supp. 2d 940, 950 (N.D. Ill. 2009) ("the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey").

38

###### C.  MillerCoors Has Failed to Show Materiality.

"Materiality is an element of an implied falsity claim."  *LG Elec. v. Whirlpool*, 2010 WL 2921633, at *3 (N.D. Ill. 2010).  This requirement "is based on the premise that not all deceptions affect consumer decisions."  *Johnson & Johnson Vision Care v. 1-800 Contacts*, 299 F.3d 1242, 1250 (11th Cir. 2002).  "A claim is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice or, or conduct regarding a product.'"  *LG Elec.*, 2010 WL 2921633, at *3; *see also Hot Wax*, 191 F.3d at 819.  "The relevant 'consumers' are the people or groups of people to whom the advertisement was addressed."  *SourceOne Dental. v. Patterson*, 328 F. Supp. 3d 53, 62 (E.D.N.Y. 2018).

MillerCoors has failed to meet its burden of establishing materiality for three reasons. First, MillerCoors' own claims since Bud Light's ads began – including that Miller Lite market share and sales have increased and that Coors Light has held share – contradict its assertion of materiality.  MillerCoors cites no authority to support its view that an allegedly false statement is material where the plaintiff claims that business has improved since the publication of that statement.

Second, MillerCoors' arguments are based on unreliable survey data and anecdotal responses on social media that provide no basis for assessing consumer decisions.  MillerCoors has stated that corn syrup is an ingredient in Miller Lite and Coors Light for years without providing the "crucial context" it now claims is necessary.  ECF No. 9, p. 24.  MillerCoors never explains how ads that convey the same information it has already made available could be "material."  There is no reliable evidence to support these claims, and a party's mere say-so does not satisfy the clear showing required for a preliminary injunction.

Third, there is no merit to MillerCoors' speculative and irrelevant arguments regarding advertising costs. ECF No. 9, pp. 31-32. Costs are not probative of materiality. Rather, the materiality inquiry is focused on the effects on the consumer. *See Hot Wax*, 191 F.3d at 819. MillerCoors' belief that advertising costs tend to prove materiality (since a party presumably would not spend money on advertising it believed to be ineffective) would eviscerate this requirement for any "high-profile, costly advertisements" – a position lacking any basis in law.

**D.     MillerCoors' Claims in the Marketplace Rebut Any Presumption of Injury to Business Interests or Reputation.**

To prevail on a false advertising claim, a Lanham Act plaintiff must show that it "has been or is likely to be injured as a result of the false statement." *Arla Foods*, 893 F.3d at 382. MillerCoors argues that harm to goodwill and business position may be presumed where a competitor has made "disparaging false statements about a competitor's product." ECF No. 9, p. 32. In *Market Track*, the presumption of injury applied in circumstances where the defendant made literally false statements regarding the plaintiff's services. *Market Track v. Efficient Collaborative Retail*, 2015 WL 3637740, at *22 (N.D. Ill. 2015). Bud Light's ads, in contrast, are truthful and not disparaging.

To the extent a presumption of injury does apply, it is rebutted by the evidence, which contradicts MillerCoors' claims of harm to business or reputation. Since February 2019, MillerCoors has asserted that Miller Lite market share and sales have improved and Coors Light market share has held. Social media posts by the company have made similar claims since Bud Light's advertising began. Goeler Dec. ¶¶ 31-32. In public statements, MillerCoors executives have expressed "confiden[ce] that our competitive advertising highlighting the positive attributes of Miller Lite is working," and said that "Anheuser-Busch could not have handled it as a better gift if they tried harder." Goeler Dec. ¶ 30; Harrison Dec., Ex. 14 (Feb. 13, 2019 *Milwaukee*

*Bus. J.*, "MillerCoors CEO calls Bud Light ads a 'gift'").  In one-on-one conversations with A-B, MillerCoors executives have expressed similar sentiments of gratitude.  Vargas Dec. ¶¶ 3-4; Hart Dec. ¶¶ 3-4.  And, Miller Lite's full-page ad in the New York Times publicly thanked Bud Light for "starting this conversation on such a big stage."  Goeler Dec. ¶ 29.  These claims that MillerCoors appreciates Bud Light's advertising and has experienced improved or stable market share and sales are flatly inconsistent with any claim of injury.

## II.    MillerCoors Has Failed to Show an Irreparable Injury for Which There Is No Adequate Remedy at Law.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Danone*, 2019 WL 760040, at \*6, \*12 (describing irreparable injury as the "*sine qua non* of the preliminary injunction").  A plaintiff must demonstrate that, without a preliminary injunction, "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of the trial to resolve the harm."  *Id.* at \*12; *see also Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007) (a plaintiff cannot establish "the existence of irreparable harm through the mere possibility" that there will be an adverse consequence from defendant's actions).  A "mere subjective belief" of injury is insufficient.  *Borden*, 1984 WL 1458, at \*17.

### A.    There is No Presumption of Irreparable Harm, It Must be Proven to Justify an Injunction.

MillerCoors asks the Court to apply an incorrect legal standard, attempting to invoke an overruled and outdated presumption of irreparable harm.  The Supreme Court has eliminated this presumption, requiring a plaintiff to demonstrate irreparable injury to justify an injunction. *Winter*, 555 U.S. 7; *eBay v. MercExchange*, 547 U.S. 388 (2006).

41

In 2006, in *eBay* the Supreme Court rejected the practice of automatically entering permanent injunctions at the conclusion of patent cases and ruled that courts must consider all four equitable factors in fashioning injunctive relief.  547 U.S. at 393-94.  In 2008, the Supreme Court applied this reasoning to preliminary injunctions as well.  *Winter*, 555 U.S. at 22.  In *Winter*, the Supreme Court reversed a preliminary injunction on the ground that the standard applied by the Ninth Circuit was "too lenient" and therefore "inconsistent with the characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff may be entitled to relief."  *Id.*  The Supreme Court reiterated that the proper standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."  *Id.; see also Flexible Lifeline v. Precision Lift*, 654 F.3d 989, 996 (9th Cir. 2011).

Following *eBay* and *Winter*, numerous courts have declined to apply the presumption of irreparable harm, even in Lanham Act and other intellectual property cases.  *See, e.g., Ferring Pharm.*, 765 F.3d at 216 (holding that "there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases"); *Herb Reed Enters. v. Fla. Ent't Mgmt.*, 736 F.3d 1239, 1249-50 (9th Cir. 2013), *cert denied* 135 S. Ct. 57 (2013) (applying *eBay* to trademark case); *N. Am. Med. v. Axiom Worldwide*, 522 F.3d 1211, 1228 (11th Cir. 2008) (noting in dicta that "a strong case can be made that *eBay*'s holding necessarily extends to the grant of preliminary injunctions under the Lanham Act"); *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("The court must not adopt a 'categorical' or "general" rule or presume that the plaintiff will suffer irreparable harm … the court must actually consider the injury the plaintiff will suffer….").  Courts in this circuit also have applied *eBay* to Lanham Act claims, reasoning that "[t]he Lanham Act, like the Patent Act, does not include any exception from the traditional

standards for injunctive relief." *Timothy B. O'Brien v. Knott*, 2018 WL 5456550, at \*5 (W.D.

Wis. 2018) (stating that *eBay* likely "would apply with equal force to trademark cases" and that

"no circuit has gone the other way"); *Nat'l Fin. Partners v. Paycom Software*, 2015 WL

3633987, at \*11 (N.D. Ill. 2015) (noting while *eBay*'s application to preliminary injunctions in

Lanham Act cases is unresolved in the Seventh Circuit, "[t]he Court sees no reason why the

Seventh Circuit would reach a different conclusion"); *see Flava Works v. Gunter*, 689 F.3d 754,

755 (7th Cir. 2012) (stating that "we are persuaded … that *eBay* governs a motion for a

preliminary injunction in a copyright case, as well"). Consistent with these decisions, no

presumption of irreparable injury should apply here.[15]

### B.   MillerCoors Has Failed to Show Irreparable Injury.

While MillerCoors claims irreparable injury in its legal papers, its statements in the

marketplace (discussed previously) are the exact opposite. As *Danone* concluded, evidence of

improved market share "strongly suggests that neither [the plaintiff's product's] sales position

nor its brand equity have suffered irreparably." 2019 WL 760040, at \*12. The evidence here is

even stronger: unlike Dannon, MillerCoors has claimed increased sales (in both dollars and

volume). Goeler Dec. ¶ 31; *see also Borden*, 1984 WL 1458, at \*17 (increased sales and market

share "vividly illustrate that [plaintiff] has not and will not be irreparably harmed by

[defendant's] advertising campaign").

---

[15] MillerCoors argues that courts have applied a presumption of irreparable harm in comparative
advertising cases post-*eBay*, but the two decisions it cites from the Western District of Wisconsin
do not discuss *eBay* at all. *E.g.*, *Mgmt. Grp. v. T&G Consultant*, 2016 WL 3830585, at \*6 (W.D.
Wis. 2016); *N. Star Indus. v. Douglas Dynamics*, 848 F. Supp. 2d 934, 949 (E.D. Wis. 2012). In
*Redbox Automated Retail v. Xpress Retail*, 310 F. Supp. 3d 949 (N.D. Ill. 2018), the court found
that plaintiffs' delay precluded a finding of irreparable harm and denied a preliminary injunction.

MillerCoors is unable to explain how it is being irreparably harmed by advertising that merely uses the language used by MillerCoors itself to describe beer ingredients. *See Healthnow*, 2015 WL 5673123, at *6. The absence of legal support for this view is apparent from MillerCoors' reliance on *Qatar Investments v. John Doe*, 2017 WL 7053641 (W.D. Wis. Sept. 6, 2017), which is not a Lanham Act case among industry competitors, but instead was an inapposite defamation lawsuit that dealt with false claims of sexual abuse of a minor. *Id.* at *1.[16]

MillerCoors claims irreparable injury based on Bud Light's advertising that purportedly has "called into question" the brands' "reputations among consumers as being authentic, a good value, and of high quality." ECF No. 9, p. 35. It relies on the 18% of consumers who allegedly contacted the Consumer Affairs Department in February and March 2019 and whose communications MillerCoors has classified as being related to corn syrup. As previously discussed, this 18% consists of a net total of 25 people out of "hundreds of millions." MillerCoors also argues that reputational harm is shown through social media posts indicating "negative sentiment toward corn syrup in connection with beer or beer brewing." ECF No. 9, p. 35. Such conclusory claims of harm do not establish the clear showing of irreparable injury required for a preliminary injunction.

Instead, the injury that MillerCoors alleges is quintessentially "remote" and "speculative," rather than "actual and imminent." *Danone*, 2019 WL 760040; *see also Borden*, 1984 WL 1458, at *17 (rejecting "vague claim of irreparable injury caused by a false impression created in the mind of the consumers"). No evidence supports its claim that consumers are questioning the brands' alleged reputation for authenticity, value, and quality. Nothing in its

---

[16] MillerCoors' discussion of *McNeilab v. Am. Home Prods.*, 848 F.2d 34, 38 (2d Cir. 1988), is also inapt. There, the court applied the presumption of irreparable harm that has been laid to rest by *eBay* and *Winter*.

litigation survey (which is, in any event, unreliable) touches upon these reputational issues. Rather, MillerCoors seeks to enjoin Bud Light's national advertising campaign on the basis of comments by roughly two dozen people and anecdotal posts on social media.

MillerCoors' claims of reputational harm are very similar to those addressed recently in *Danone*. Dannon claimed that Chobani's ads comparing the amounts of sugar in yogurts marketed to children were causing irreparable harm to its reputation as a seller of "healthy and nutritious children's snacks." 2019 WL 760040, at *13. The court rejected this argument, stating that "Chobani has a perfect legal right to beat Dannon at its own game by marketing a competing product that has less sugar," and that Dannon's claim of injury was undercut by its use of stale packaging that overstated the amount of sugar in Dannon's products. *Id.* These points apply here: Bud Light has a "perfect legal right" to market truthful claims about corn syrup, and MillerCoors' own failure to publish the disclaimers it now claims are "material" "do[es] not jibe" with its theory of irreparable injury. *Id.* Given its unqualified publication of ingredient information for years, "it does not lie in [MillerCoors'] mouth to argue that it will suffer irreparable harm." *Id.*

MillerCoors' delay in seeking the extraordinary remedy of a preliminary injunction further undercuts its claim of irreparable harm. Bud Light first aired its ads during Super Bowl LIII, on February 3, 2019. ECF No. 1, ¶ 1. However, MillerCoors waited until March 28 to file its motion seeking a preliminary injunction. An "undue delay of even weeks" "speaks volumes about whether a plaintiff is being irreparably injured." *Borden*, 1984 WL 1458, at *16. MillerCoors' delay of more than seven weeks belies its claim that any injuries are immediate and irreparable. *E.g.*, *Citibank v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (10-week delay after actual knowledge "undercuts the sense of urgency that ordinarily accompanies a motion for

preliminary relief and suggests that there is, in fact, no irreparable injury"); *Stokely–Van Camp v. Coca–Cola.*, 1987 WL 6300, at *3 (N.D. Ill. 1987) (three-month delay indicated "lack of a need for the extraordinary remedy of a preliminary injunction"); *Le Cordon Bleu v. BPC Pub.*, 327 F. Supp. 267, 271 (S.D.N.Y. 1971) (eight or thirteen-week delay showed failure to "move expeditiously").

### III.   The Balance of Equities Weighs Strongly Against Granting a Preliminary Injunction.

There is no need to consider the equities in a case where, as here, there is no showing of irreparable harm.  *Ty.* v. *GMA Accessories*, 132 F.3d 1167, 1172 (7th Cir. 1997) ("a plaintiff who cannot show any irreparable harm at all from the withholding of a preliminary injunction is not entitled to an injunction however strong his case on the merits, for he has no need for preliminary relief in such a case, no need therefore to short circuit the ordinary process of the law.").  But even applying that analysis, equitable considerations weigh strongly against granting a preliminary injunction because there is little chance of success on the merits, no showing of irreparable harm to MillerCoors, and significant potential for irreparable harm to AB and the public.

When balancing the equities, "the court employs a sliding-scale approach and weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied."  *HH-Indianapolis*, 889 F.3d at 437.  Under this "sliding scale approach," "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side."  *Abbott Labs.*, 971 F.2d at 12.

46

As shown above, MillerCoors cannot succeed on the merits.  Bud Light's advertisements are true, repeat ingredients published by MillerCoors, and are entirely distinguishable from cases like *Arla Foods* where the ads made disparaging claims and were contrary to regulatory guidance.  MillerCoors has produced no reliable evidence of actual consumer confusion to establish that the truthful ads are somehow misleading.  Because MillerCoors cannot succeed on the merits, MillerCoors must make a strong showing of irreparable harm.  As discussed above, it cannot.

In contrast, a preliminary injunction <u>will</u> cause immediate and substantial harm to Bud Light that cannot be reasonably quantified and is not compensable by money damages.  Bud Light has already spent substantial sums of money coordinating a multi-faceted advertising campaign to capitalize on the timing of its new nutritional labeling.  A preliminary injunction also will cause reputational harm and loss of goodwill by requiring Bud Light to forfeit advertising slots, damaging relationships with retailers, and giving the public the false impression that MillerCoors has substantiated its claims and that Bud Light is misrepresenting either its own or MillerCoors' ingredients.  A preliminary injunction "is not warranted when such extraordinary expense and injury to defendant would result."  *Borden*, 1984 WL 1458, at *18 (finding the "impact upon [the defendant] would be devastating" where grant of preliminary injunctive relief would cause millions of dollars in losses for "developing, producing, testing and airing" the ads and reserved ad slots would need to be liquidated).

Granting a preliminary injunction would be deeply contrary to the public interest. MillerCoors seeks judicial intervention to prevent the critical "free flow of commercial information" that is "indispensable" to intelligent consumer decision-making – simply because Bud Light's advertising makes truthful claims about corn syrup that MillerCoors would prefer

47

not to highlight to consumers.  *Va. St. Bd. of Pharm.*, 425 U.S. at 763-65.  It is widely recognized that "[t]ruthful and nondeceptive" comparative advertising is "a source of important information to consumers and assists them in making rational purchase decisions."  *Triangle Publ'n. v. Knight-Ridder*, 626 F.2d 1171, 1176 n.13 (5th Cir. 1980); *Mead Johnson*, 209 F.3d at 1034 (helping consumers find superior products). In addition, "[t]he FTC believes that consumers gain from comparative advertising, and to make the comparison vivid the Commission 'encourages the naming of, or reference to competitors.'"  *August Storck K.G. v. Nabisco*, 59 F.3d 616, 618 (7th Cir. 1995).

MillerCoors' position is contrary to its stated commitment to transparency and Seventh Circuit case law acknowledging that "[s]ociety has a strong interest 'in the free flow of commercial information' critical to a free market economy…."  *Kraft*, 970 F.2d at 320 (citing *Va. State Bd. of Pharm.*, 425 U.S. at 763).  American consumers are demanding transparency and are becoming more conscious of the ingredients in their foods and drinks.  Goeler Dec. ¶ 9.  Bud Light is providing truthful advertising about ingredients, and that is undoubtedly helpful as a source of information to consumers to assist them in making their purchase decisions.  Under MillerCoors' proposed injunction, Bud Light would be effectively barred from airing any ads that point out a differentiator between the parties' light beers: namely, that Miller Lite and Coors Light are brewed with corn syrup and Bud Light is not.  MillerCoors has not made any showing that granting a preliminary injunction and enjoining the truthful, comparative advertising at issue would benefit consumers or otherwise be in the public interest.

## IV.    MillerCoors' Unclean Hands Preclude its Request for Equitable Relief.

It is a "fundamental principle" that a party seeking equitable relief "must come with clean hands."  *Stokely-Van Camp v. Coca Cola*, 646 F. Supp. 2d 510, 532 (S.D.N.Y. 2009).  The

unclean hands doctrine "applies to Lanham Act claims." *Id.*  The defendant "must show that the plaintiff has engaged in inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks." *Id.* at 533-34 (unclean hands doctrine precluded injunctive relief where plaintiff made similar claims regarding presence of calcium and magnesium as the advertising complained of); *see also Procter & Gamble v. Ultreo*, 574 F. Supp. 2d 339, 355 (S.D.N.Y. 2008) (applying unclean hands doctrine where plaintiff "has engaged in virtually identical advertising in the past").

In advertisements on social media, MillerCoors has claimed that certain AB products "use a corn-derived sugar or corn syrup called dextrose," without any disclaimer of the sort that MillerCoors argues is necessary:



Harrison Dec., Ex. 29 (Feb. 5, 2019).  Accordingly, MillerCoors has engaged in the exact same type of advertising that it now contends is misleading, and its own unclean hands also preclude the entry of a preliminary injunction.

**V.    If a Preliminary Injunction Is Entered, MillerCoors Must Post a Bond Commensurate with Bud Light's Potential Harm.**

Federal Rule of Civil Procedure 65(c) conditions the issuance of a preliminary injunction on security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Starsurgical v. Aperta*, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011).  "The purpose of an injunction bond is to protect the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty v. Publ. Int'l*, 292 F.3d 512, 516 (7th Cir. 2002).  Although the amount of the bond is a matter of discretion, *Gateway E. Ry. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1141 (7th Cir. 1994), the Seventh Circuit has cautioned that "[w]hen setting the amount of security, district courts should err on the high side."  *Mead Johnson*, 201 F.3d at 888.

## Conclusion

For the foregoing reasons, MillerCoors' motion for a preliminary injunction should be denied.

Dated: April 18, 2019                              Respectfully submitted,

**GODFREY & KAHN, S.C.**

By: /s/ Kendall W. Harrison
    Kendall W. Harrison
    One East Main St., Suite 500
    Madison, WI, 53703
    Phone: (608) 284-2627
    Fax: (608) 257-0609
    *kharrison@gklaw.com*

**DOWD BENNETT LLP**
James F. Bennett #65673
7733 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
Phone: (314) 889-7300
Fax: (314) 863-2111
jbennett@dowdbennett.com

*Attorneys for Anheuser-Busch Companies, LLC*