UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MILLERCOORS, LLC,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>ANHEUSER-BUSCH COMPANIES, LLC,<br><br>　　　　　Defendant. | Case No. 19-cv-00218 |

**MILLERCOORS, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Anheuser-Busch Companies, LLC ("AB") has embarked on an extensive and pervasive advertising campaign ("Campaign") that seeks to mislead consumers into believing that *Miller Lite* and *Coors Light* contain corn syrup. AB's response to MillerCoors motion for preliminary injunction claims that the Campaign is nothing more than an effort at "transparency" and that there is no likelihood of consumer confusion. Nonsense. If AB truly wanted transparency, it would correct the widespread public misconceptions its own advertising created by prominently advertising what it now says it cannot deny: there is no corn syrup in *Miller Lite* or *Coors Light*.[1]

AB's assertion that its Campaign merely parrots MillerCoors public disclosure that corn syrup is an "ingredient" of its beers is untrue. Unlike the careful, factual statements on the MillerCoors websites,[2] the vast majority of AB's ads do not even say that corn syrup is an

---

[1] *See* Dkt. 30, Response to Proposed Findings of Fact, ("RPFF"), ¶18.
[2] AB misleadingly argues that, "even after filing its lawsuit, MillerCoors has not added this 'crucial context[]' to *all* of its own consumer-facing communications…." Dkt. 39, AB's Brief in Opposition, ("Opp.") at 8 (emphasis added). This is splitting hairs at best. While the corporate website identified corn syrup without specifically discussing its role in brewing, the brand-specific *Miller Lite* and *Coors Light* websites do. ("Corn Syrup is used by many of your favorite brewers, and it gets consumed by the yeast during the fermentation process. Corn syrup is not the same as high-fructose corn syrup…."); ("Corn (Continued...)

1

"ingredient;" rather, they purposefully use ambiguous words like "made with," "brewed with," or "use" to convey the false impression that corn syrup remains in the final MillerCoors beers. Their context subjects corn syrup to ridicule, and clearly suggests that it is present in the beers and that consumers should not want it there.

MillerCoors consumer survey, social media evidence, and complaint data confirm that a substantial number of consumers think *Miller Lite* and *Coors Light* contain corn syrup, which is undesirable. This false impression is created entirely by AB's Campaign. Apparently, this is the exact impression AB intended, since its own research informed it that many consumers "prefer not to consume" corn syrup. Dkt. 10, Statement of Proposed Findings of Fact ("PFF"), ¶¶69, 70.

AB's argument that MillerCoors has no legal remedy because AB carefully crafted the Campaign with words that are technically, literally true, is flat wrong. Section 43(a) of the Lanham Act protects against exactly this kind of conduct:

> Whether or not the statements made in the advertisements are literally true, s[ection] 43(a) of the Lanham Act encompasses more than blatant falsehoods. It embraces "innuendo, indirect intimations, and ambiguous suggestions" evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement.

*Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 277 (2d Cir. 1981) (citation omitted).

This brief provides further support for MillerCoors motion for preliminary injunction by addressing the four issues set forth in the Court's April 25th Order (Dkt. 44).

## I. MILLERCOORS HAS BEEN HARMED BY AB'S MISLEADING CAMPAIGN.

The Supreme Court has not "eliminated" the presumption of irreparable harm in false advertising cases. The decision relied on by AB, *eBay Inc. v. MercExchange, L.L.C.,* held that a movant in a patent case must supply persuasive evidence regarding each element for an

---

Syrup (Not High-Fructose Corn Syrup) A sugar source converted into alcohol in the fermentation process. None of it ends up in the final product….").

injunction, including harm. 547 U.S. 388, 391-92 (2006). *eBay* did not address whether harm could be presumed when a plaintiff shows it is likely to prove a competitor made false and misleading statements that name the plaintiff's product. Similarly, *Winter v. Nat. Res. Def. Council, Inc.* did not involve claims of false advertising and did not eliminate the presumption of harm in such a case. Rather, it simply held that a plaintiff alleging harm must show that irreparable injury is likely, not a mere possibility, absent an injunction. 555 U.S. 7, 21-23 (2008). Importantly, neither *eBay* nor *Winter* involved claims of false advertising. False advertising that names a competitor necessarily injures that competitor. Thus, this Court has properly continued to presume irreparable harm in Lanham Act cases. *See, e.g.*, *Shenzhen Ruobilin Network Tech., Ltd. v. SJG-Lens*, No. 16-CV-386-WMC, 2017 WL 2539152, at *2 (W.D. Wis. June 9, 2017).

MillerCoors need not, however, rely on the presumption of harm because it has <u>also</u> supplied evidence of irreparable harm, including consumer complaints about *Miller Lite* and *Coors Light,* and data showing an increase in negative social media commentary about the beers. *See, e.g.,* PFF ¶¶92-96, 102-104; Dkt. 14 Declaration of Ryan Reis ¶30; Dkt. 15, Report of Jerry Wind, Ph.D. ("Wind") ¶¶93-95, 117-118, 124, 133, 137. This evidence shows that MillerCoors is suffering concrete reputational harm and business injury. *See Ill. Bell Tel. Co. v. MCI Telecomms. Corp.,* No. 96 C 2378, 1996 WL 717466, at *9 (N.D. Ill. Dec. 9, 1996).

In response, AB points to public statements made by MillerCoors about increasing *Miller Lite* sales in the immediate aftermath of the Super Bowl. Opp. at 16-17.[3] This argument is unavailing because it ignores the negative impact to *Coors Light,* the #2 best-selling beer in America. *Id.* Moreover, even if *Miller Lite* sales increased, that does not mean no diversion of

---

[3] The sales data referred to by AB is merely a snapshot in time and sales are impacted by numerous factors, including advertising. Moreover, it should also be noted that the Campaign is ongoing and, at the time MillerCoors filed its motion, AB's ads had been increasing in intensity and expanding the injury to MillerCoors reputation, good will and future market share.

sales took place. It merely reflects the net effect on sales after MillerCoors mitigation efforts and other factors. *See* 5 McCarthy on Trademarks and Unfair Competition § 30:79 (5th ed. Mar. 2019 Update) (plaintiff may forecast sales it would have made but for violations).

Finally, it is well settled that the Lanham Act protects plaintiffs from other forms of harm besides diversion of sales. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014) ("But although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under §1125(a)"). "Irreparable injury does not require diversion of actual sales[.]" *W.L. Gore & Assocs., Inc. v. Totes Inc.,* 788 F. Supp. 800, 810 (D. Del. 1992); *see also Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir. 2002) (affirming preliminary injunction even where defendant had yet to consummate a sale by its Lanham Act violation). It also includes damage to a plaintiff's or its product's reputation. *Lexmark Int'l, Inc.,* 572 U.S. at 138. Loss of reputation, trade, or goodwill are all "[g]rounds for finding irreparable injury[.]" *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990); *see also Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) ("it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill") (citation omitted); *Bishops Bay Founders Grp., Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, 913 (W.D. Wis. 2003) ("damage to the good will and prominence of plaintiff's mark through public confusion is an irreparable injury").

## II.     AB'S CRITICISMS OF THE WIND REPORT LACK MERIT.

AB attempts to minimize MillerCoors likelihood of success by having its survey expert recite a typical list of survey criticisms. None of these criticisms undermine the survey and other corroborating evidence addressed by Dr. Wind in any real way, which show that a substantial

4

percentage of consumers who view a Campaign ad are likely to have been misled into believing that *Miller Lite* and *Coors Light* contain corn syrup. AB's criticisms lack merit and at most go only to the **weight** the Court might afford the survey, not to its admissibility. *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 131 (2d Cir. 2000) ("A district court has broad discretion concerning the weight of particular evidence, including consumer surveys such as those proffered here. . ."); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) ("The probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate.") (internal citations omitted).

First, AB's expert, Dr. Hauser, asserts that Dr. Wind should have tested the "Special Delivery" ad rather than the "Mountain Men" ad.[4] Dr. Hauser did not test any AB ads himself and simply speculates regarding reasons why testing the Special Delivery ad might have produced a different result.[5] Both the "Special Delivery" and "Mountain Men" ads compare the respective beers and highlight corn syrup. "Mountain Men" is arguably the more neutral of the two.

Second, AB's expert says Dr. Wind should not have asked respondents about the main message of the ad without first asking a "filter question" about whether they even took away a "main message." He speculates that viewers might simply have "been intrigued by the comedic

---

[4] While the Seventh Circuit ruled that "[c]onsumer surveys or other 'hard' evidence of actual consumer confusion are unnecessary at the preliminary-injunction stage[,]" *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 379 (7th Cir. 2018), MillerCoors undertook the effort to collect extrinsic evidence regarding the impact AB's deceptive messages have had on consumers. Notably, AB criticized MillerCoors for delaying its motion.

[5] Dkt. 36, Declaration of John Hauser, SC.D. ("Hauser") ¶¶38-40. Dr. Hauser also attempts to make much of the fact that the Wind Report contained a typo referring to a version of the control ad disclaimer that was pre-tested. It is common in consumer surveys to pretest to ensure consumer understanding, which Dr. Wind did here. *See* Wind ¶21. Hauser's criticism in this regard is irrelevant to the weight Dr. Wind's survey should be afforded.

5

component" of the ad and not have thought about any main message. Hauser ¶23. This is absurd. AB did not create the ads merely to be funny. It clearly intended consumers to take away a message about corn syrup. Moreover, the question about the main message was open-ended. Wind ¶¶48-49. If respondents perceived only a comedic message they could have said so, but overwhelmingly did not. Approximately 90% of respondents in fact answered that the main message of the ad was about *Miller Lite* or *Coors Light,* and/or was about corn syrup. *See* Wind Survey Raw Data.[6] Very few respondents provided an answer to this question indicating that they did not discern a main message.

Third, Dr. Hauser asserts that all respondents were asked what he claims are leading questions QF7a and QF7b.[7] He argues that the questions, which include the phrase "corn syrup," biased the results by introducing the topic of "corn syrup" to respondents who might not have thought about corn syrup absent the question wording. Hauser ¶23. This criticism ignores that fact that 1,442 respondents out of 2,034 respondents (71%) had already provided an answer to prior open-ended questions in which they mentioned corn syrup. Of those 1,442, approximately 35% said that *Miller Lite* or *Coors Light* is made with corn syrup, or something similar. *See* Wind Survey Raw Data. This percentage of respondents did not vary significantly between those who saw the test ad and those who saw the control ad, underscoring that the question (and

---

[6] While the raw data reflecting respondents' verbatim answers to the survey questionnaire were not appended to the Wind Report, it was provided to AB's counsel as part of the informal discovery process.
[7] QF7a asked: "Which, if any of the following statements does the TV commercial say, suggest or imply? (*Select one only*): 1. Miller Lite [and/or Coors Light] is/are not made with corn syrup; 2. Miller Lite [and/or Coors Light] is/are made with corn syrup; 3. Neither; 4. Don't Know/Unsure." Only respondents selecting option 2 were asked QF7b: "You said Miller Lite (and/or Coors Light) is made with corn syrup. Being "made with" corn syrup may mean a number of different things. Which, if any, of the following statements does the TV commercial say, suggest or imply about Miller Lite [or Coors Light]? 1. Corn syrup is used only during the brewing process for Miller Lite, but is not in the Miller Lite you drink; 2. Corn syrup is only in the Miller Lite you drink, but is not used during the brewing process for Miller Lite; 3. Corn syrup is both used during the brewing process for Miller Lite and is in the Miller Lite you drink; 4. None of the statements above; 97. Don't know/Unsure." Wind ¶¶62-63.

6

control disclaimer) did not bias respondents. *Id*.

Fourth, Dr. Hauser surmises that bias was likely created by the use of "probe" questions, but he fails to provide any evidence regarding whether this actually affected results. Hauser ¶¶25-27. For example, with no supporting evidentiary basis, Dr. Hauser claims that the wording of QF7a, which began with the statement "You said that [beer] is made with corn syrup" created bias because the question should have instead tied the question to what the ad said, *i.e.,* "You said that the commercial states that [beer] is made with corn syrup." *Id.* ¶27. Dr. Hauser fails to explain how the wording Dr. Wind used biased respondents to provide answers favorable to MillerCoors, and also ignores the second part of the question, which expressly focuses the respondent on the ad's communication: "Which, if any, of the following statements does the TV commercial say, suggest or imply about Miller Lite [or Coors Light]?" Wind ¶63.

Fifth, Dr. Hauser opines that the control ad Dr. Wind used was invalid because the disclaimer "trained" respondents to recognize phrases such that evidence of deception shown in response to QF7b was purely the result of a leading question. Hauser ¶¶29-30. It is well accepted in the survey profession that an appropriate and effective control stimulus may use a disclaimer to eliminate the deceptive element of the ad. "[I]n false advertising cases, a good control might involve adding a disclaimer aimed at the false inference. That is, this often excellent form of control doesn't eliminate anything, but instead adds something." M. Rappeport, "Design Issues for Controls," in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (edited by Shari Seidman Diamond and Jerre B. Swann) ABA Publishing, 2012 (pp. 217-240, at 226). Moreover, Dr. Hauser's argument has been rejected by the very authority he cites. The highly-influential "Reference Guide on Survey Research," which is part of the Federal Judicial Center's Reference Manual on Scientific Evidence provided to the federal judiciary, states the

7

following:

> if respondents who viewed the allegedly deceptive commercial respond differently than respondents who viewed the control commercial, the *difference cannot be merely the result of a leading question, because both groups answered the same question*. The ability to evaluate the effect of the wording of a particular question makes the control group design particularly useful in assessing responses to closed-ended questions . . . .

Shari Seidman Diamond, Reference Guide on Survey Research, in Reference Manual on Scientific Evidence (Fed. Jud. Ctr., 3d ed. 2011), at 399. If the results were due to a leading question, both test and control respondents would have answered similarly. The fact that they did not in this case, showing instead a significant difference between test and control responses to QF7b, is evidence that the tested commercial is in fact deceiving consumers.

Sixth, Dr. Hauser opines that QF8 was improper because it introduced the concept of a relationship between corn syrup and high fructose corn syrup ("HFCS"), which is not communicated by the ad. Hauser ¶43. This is a red herring. Dr. Wind did not pose this question to measure confusion caused by the ad, but rather to measure any pre-existing consumer misunderstanding of the relationship between corn syrup and HFCS. The best way to take this measurement is to ask the question in a straightforward, non-misleading manner and give respondents the option of indicating that they don't know or have no opinion, as Dr. Wind did.

Dr. Hauser next attempts to recalculate the reach of AB's Campaign by altering the social media data set. Hauser ¶¶57-63. This does not cast doubt on Dr. Wind's findings but, instead, merely attempts to portray the findings as less significant by applying a different denominator. Dr. Wind compared the number of posts expressing negative sentiment with all posts mentioning both corn syrup and one of the beers, finding that 22% of those posts were negative. Wind ¶117. Dr. Hauser instead compared the negative mentions of corn syrup in *Miller Lite* or *Coors Light* to **all** posts mentioning those beers. Hauser ¶¶59-63. His recalculation does not change the

8

absolute number of negative mentions, or alter the fact that there was substantial negative social media commentary regarding the use of corn syrup in *Miller Lite* and *Coors Light*.

In similar fashion, Dr. Hauser argues that the complaints received by the MillerCoors consumer comment line regarding corn syrup, all of which commenced after AB's first ad, are insignificant relative to the total universe of *Miller Lite* and *Coors Light* drinkers. Hauser ¶¶54-56. This misses the point. Dr. Wind compared consumer complaints regarding corn syrup both before and after the AB ads began, and observed a dramatic spike in consumer complaints about corn syrup right after the Campaign launched. Wind ¶¶93-95.

### III. MILLERCOORS WAS PROMPT IN SEEKING RELIEF.

MillerCoors moved for a preliminary injunction a mere **seven weeks** after AB ran its first ad, after exhausting efforts to mitigate the harm through counter-advertising, and also conducting necessary research to support its case – all the while being subject to a continuously unfolding barrage of false claims from AB. *See* PFF ¶¶26-67, 72-73. Under these circumstances, this cannot be considered undue "delay." *See, e.g. Schick Mfg., Inc. v. Gillette Co.*, 372 F. Supp. 2d 273, 283 (D. Conn. 2005) (granting preliminary injunction sought eight months after advertising began "to subject the claims made in the contested advertising to scientific testing"); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* No. 14-137, 2014 WL 2002126, at *11 (W.D. Pa. May 15, 2014), *aff'd*, 774 F.3d 192 (3d Cir. 2014) (granting preliminary injunction motion filed after three and a half months during which plaintiff conducted testing). AB does not cite a single case holding that a seven-week period of time to collect evidence to support a preliminary injunction was undue delay.[8] Nor does AB claim that it has been prejudiced. A preliminary

---

[8] In each case cited by AB, plaintiff waited longer than the seven weeks that MillerCoors used to conduct its consumer survey. *See e.g., Borden, Inc. v. Kraft, Inc.*, No. 84 C 5295, 1984 WL 1458, at *16 (N.D. Ill. (Continued...)

9

injunction is still proper, even where a plaintiff waited eight months, if "it cannot be said that this minimal delay lulled Defendant into a false sense of security, nor that the delay was unreasonable." *Ty, Inc.,* 237 F.3d at 903.

## IV. MILLERCOORS DOES NOT HAVE UNCLEAN HANDS.

AB argues that MillerCoors effort to defend itself in a tweet posted on February 5 constitutes "unclean hands." Opp. at 49. The tweet truthfully states that some AB beers also use a "corn-derived sugar or corn syrup called dextrose." *Id.* AB argues that if the Court finds AB's ads misleading, it should also conclude that this tweet is "the exact same type of advertising that it now contends is misleading." *Id.*

The defensive context of the tweet is fatal to AB's argument. The tweet responds to AB's "transparency" justification for its Campaign by pointing out AB's failure to mention that the very "ingredient" it highlights is also used by AB. MillerCoors had nothing to gain from this statement other than to point out the hypocrisy of AB's Campaign. "The doctrine of 'unclean hands' . . . means that equitable relief will be refused if it would give the plaintiff a wrongful gain." *Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1021 (7th Cir. 2002). It simply is inapplicable in this context, and is also disfavored when a plaintiff seeks to enforce laws that protect the public. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995); *see also Dyson, Inc. v. Sharkninja Operating LLC,* 259 F. Supp. 3d 816, 836 (N.D. Ill. 2017) (unclean hands fails if it leaves "two wrongs at large") (internal citations omitted).

---

Sept. 28, 1984) (5 months); *Le Cordon Bleu v. BPC Publ'g Ltd.*, 327 F. Supp. 267, 270-71 (S.D.N.Y. 1971) (13 weeks).

10

Case: 3:19-cv-00218-wmc   Document #: 48   Filed: 05/09/19   Page 11 of 12

Respectfully submitted this 9th day of May, 2019.

*/s/ Donald Schott*

Donald Schott
don.schott@quarles.com
Anita Marie Boor
anita.boor@quarles.com
QUARLES & BRADY, LLP
33 East Main Street, Suite 900
Madison, WI 53703
(608) 283-2452

Christopher A. Cole
ccole@crowell.com
David Ervin
dervin@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2701

Holly Melton
hmelton@crowell.com
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 895-4258

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2019 I caused a copy of the foregoing document to be served via ECF on counsel for Defendant Anheuser-Busch Companies, LLC.

*/s/ Donald Schott*
Donald Schott